IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. 04-cv-00438-JLK-MEH

JOSEPH M. ALIOTO,

    Plaintiff and Counterclaim Defendant,

v.

TIMOTHY C. HOILES,

    Defendant and Counterclaim Plaintiff.

# AMENDED ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Timothy Hoiles's Motion for Summary Judgment on the Issue of Ratification (doc. # 496), filed on June 5, 2007. Plaintiff Joseph Alioto filed a response on December 5, 2007 (doc. # 540) after conducting additional limited discovery on the ratification issue, and Hoiles replied on December 13, 2007 (doc. # 541). The motion is ripe for disposition.

## I. PROCEDURAL BACKGROUND AND THE COURT'S PRIOR ORDERS

In this long running dispute over attorney's fees, Plaintiff Alioto, a California attorney, seeks to recover his attorney's fees from Defendant Hoiles, a former client of Alioto's, under a contingency fee agreement between the parties. Hoiles originally filed suit on March 5, 2004, seeking a declaratory judgment that Alioto was not entitled to a contingency fee, and Alioto counterclaimed for breach of contract, unjust enrichment,

fraud, and negligent misrepresentation.[1] Judge Figa initially held that Colorado law applied to the parties' claims, held that the fee agreement was unenforceable under Colorado law, and dismissed Alioto's breach of contract and tort claims. The case proceeded to trial on the unjust enrichment claim, and the jury found in Alioto's favor and awarded him $1,150,000, which constituted the reasonable value of his services.

The Tenth Circuit reversed Judge Figa's dismissal of Alioto's breach of contract claim, holding that California law applied and remanding for a determination of whether the fee agreement was enforceable under California law. The Tenth Circuit also reinstated Alioto's fraud and negligent misrepresentation claims. On remand, the parties filed cross motions for summary judgment, which Judge Figa denied. The case was subsequently reassigned to me, and I issued several orders that provide the necessary background for my ruling on the underlying motion.

On May 29, 2007 (doc. # 493), I issued a Memorandum Opinion and Order in which I reconsidered some of Judge Figa's prior rulings in light of the recent California Court of Appeal decision in *Fergus v. Songer*, 59 Cal. Rptr. 3d 273 (Ct. App. 2007). In that order, I held in pertinent part: (1) the fee agreement between Hoiles and Alioto does not comply with Cal. Bus. & Prof. Code § 6147, the California statute governing attorney contingency fee agreements, and was therefore voidable at Hoiles's option; (2) the issue of whether Hoiles ratified the fee agreement with knowledge of his right to void it is one of fact for the jury; (3) Alioto's ability to proceed on his breach of contract

---

[1] Hoiles was originally the plaintiff in this action and Alioto the defendant. After the Tenth Circuit remanded the case, the parties were realigned to reflect their current designations.

and fraud claims is dependent on the jury's resolution of the ratification issue; and (4) if the jury finds Hoiles did not ratify the agreement and Alioto is only entitled to recover from Hoiles for the reasonable value of his services under a *quantum meruit* theory, the prior jury verdict and judgment on that claim will stand and there will be no need to retry it, as Judge Figa's jury instructions on *quantum meruit* damages in the first trial comported with California law. I denied Alioto's motion to reconsider this order on June 11, 2007 (doc. # 503).

Hoiles subsequently filed the underlying motion, contending he did not ratify the fee agreement as a matter of law. Alioto was granted leave to conduct limited discovery, and Hoiles filed a motion for protective order seeking to limit the scope of such discovery. I issued an amended order on the motion on August 8, 2007 (doc. # 524), in which I made several rulings relevant to the ratification issue and the underlying motion. First, I emphasized, as I do today, that attorney fee agreements are not considered ordinary, arms-length contracts; rather, they are governed by statutes like § 6147 that "specifically delineat[e] the required contents" of the agreement for the purposes of protecting clients and "assur[ing] fee agreements are fair and understood by clients." *Alderman v. Hamilton*, 205 Cal. App. 3d 1033, 1037 (1988). I also held: (1) in light of *Fergus*, to prove the defense of ratification Alioto must show that Hoiles ratified the agreement with full knowledge of his right to void it; (2) the knowledge of Hoiles's attorneys as to the agreement's enforceability may not be imputed to Hoiles for purposes of ratification; (3) Hoiles's actual knowledge as to the fee agreement's enforceability is only relevant to the extent he obtained such knowledge before he

3

exercised his option to void the agreement; (4) Hoiles effectively voided the contingency fee agreement on January 21, 2004, the date he instructed Alioto "to take no further actions as a lawyer on [Hoiles's] behalf" and indicated he would pay Alioto an hourly, rather than a contingent, fee for his services; and (5) therefore, any knowledge of the fee agreement's enforceability that Hoiles accrued after that date was not relevant to the ratification issue. I denied Alioto's motion to reconsider this order on September 6, 2007 (doc. # 531).

## II.     FACTUAL BACKGROUND

Hoiles hired Alioto to assist him in selling stock he owned in a private, family-owned media company, Freedom Communications, Inc. ("Freedom"). Alioto was initially recommended to Hoiles by Joseph Barletta, a non-practicing attorney who had served primarily as a business advisor to Hoiles in the past and who was consulting with Hoiles on improving Freedom's operations.[2] Alioto prepared the fee agreement, which generally provided for a contingency fee and an alternative, hourly fee under certain circumstances. Alioto originally faxed the proposed agreement to Hoiles and Barletta on August 17, 2001. Hoiles did not sign it until on or about March 2, 2002, although the parties agree that Alioto provided legal services to Hoiles before he signed the agreement.

---

[2] Barletta testified that he had been admitted to practice law in Pennsylvania, New York, and Illinois, that he had let his license lapse or turn inactive in Pennsylvania and New York, and that his license has remained active in Illinois because he has two brothers living there. (Ex. 4 to Def.'s Mot. at 12.) When asked about the nature of the services he has provided to Hoiles over the years, Barletta testified that his relationship with Hoiles was "sometimes characterize[d] . . . as attorney-client in order to . . . keep matters confidential," but that it "[p]rimarily, if not exclusively," involved general business advice rather than legal advice. (*Id.*)

The parties dispute the extent and nature of the legal advice Hoiles obtained regarding the agreement before he signed it. Alioto, Hoiles, and Barletta had a meeting on September 6, 2001, during which they discussed the agreement and Alioto clarified the purpose of the alternative, hourly fee provision. (Ex. 27 to Pl.'s Resp. at 767–68.) Alioto apparently faxed another copy of the fee agreement to Barletta on January 14, 2002. Barletta testified that he did not think he read the agreement when it was originally faxed to him, but that he assumed based on a conversation with Hoiles that attorneys Peter Susemihl and/or Richard Quan would examine the agreement before Hoiles signed it. (Ex. 4 to Def.'s Mot. at 118.)

On January 22, 2002, Hoiles faxed the agreement to Peter Susemihl, Hoiles's lawyer in Colorado Springs, and Richard Quan, a California lawyer. (Ex. 1 to Def.'s Mot. ¶ 5.) Susemihl testified that: his understanding was that Hoiles sent him the fee agreement simply as an "FYI" and he accordingly just "threw it in the file"; he did not recall reading the agreement before filing it or at any time before the underlying litigation ensued; he did not do any research regarding the validity or enforceability of the agreement; and he was not asked to give and did not give Hoiles any advice on the agreement. (Ex. 3 to Def.'s Mot. at 40, 45–47.) Hoiles testified that he was being "pushed" by Barletta to get the agreement signed, so Hoiles asked Susemihl whether he had had a chance to review the agreement. (Ex. 28 to Pl.'s Resp. at 176, 179.) According to Hoiles, during this "three- to five-minute" conversation Susemihl stated he had "not really" had a chance to look at the agreement and asked Hoiles how long he had been working with Alioto. (*Id.* at 176.) Hoiles informed him they had been working

5

together for six to eight months, and Susemihl responded that he believed they had a contract. (*Id.* at 176, 181; *see also* Ex. 7 to Pl.'s Resp. at 362 (Hoiles's testimony from first trial that, before he signed the agreement, Susemihl told him, "You have a contract.")) This conversation apparently occurred on the same day Hoiles signed the agreement. (Ex. 28 to Pl.'s Resp. at 178–79.)

With regard to Quan, the California attorney to whom Hoiles sent the agreement, Hoiles testified that Quan gave him no advice about the agreement. (Ex. 7 to Pl.'s Resp. at 358.) Quan testified that Hoiles sent him the agreement at some point "as a matter of information," but that he did not review it or advise Hoiles about it, as he "understood the engagement [between Hoiles and Alioto] to be in place at the time." (Ex. 2 to Def.'s Mot. at 18–19.)

On December 17, 2003, Freedom's shareholders voted to recapitalize the company, which allowed shares of Freedom to be sold for $212.71 a share. Shortly after the shareholder vote, Alioto requested payment of his contingency fee, which led to the ongoing fee dispute and to Hoiles's obtaining separate counsel, Glen Johnson, to advise him regarding the dispute. Hoiles testified that, during the December 2003 to January 2004 time frame, he had "[a] small amount of doubt" about the validity of the fee agreement. (Ex. 21 to Pl.'s Resp. at 20.) He also testified that he initially contacted Johnson by phone around January 12–14, 2004, and first met with him a few days later on January 17th or 18th. (*Id.* at 38–39.) At that point, Johnson advised Hoiles that he needed time to do some research and that in the meantime Hoiles should "do nothing,"

6

meaning he "was not to have conversations" with Alioto and "was not to pay any bills." (*Id.* at 38, 135–36.)

On January 21, 2004, Hoiles sent Alioto a letter that had been jointly drafted by Hoiles and Johnson and that instructed Alioto "to take no further actions as a lawyer on [Hoiles's] behalf," to submit a billing statement for the services of Alioto and his co-counsel based on an hourly fee, and to contact Johnson rather than Hoiles in the future regarding the dispute. (Ex. 1B to Def.'s Mot.; Ex. 21 to Pl.'s Resp. at 37.) On February 9, 2004, Hoiles sent Alioto a letter reiterating the request that Alioto "provide no further legal services at this time" and stating that "I still consider you to be bound by our attorney-client relationship and to have obligations under our contract." (Ex. 18 to Pl.'s Resp.) On February 20, 2004, Hoiles sent a letter to Alioto's co-counsel on the Freedom matter, with a copy to Alioto, stating in part that "I have not terminated Joe Alioto nor has he resigned as my lawyer." (Ex. 19 to Pl.'s Resp.) Both of the February letters were jointly drafted by Hoiles and his attorney, Johnson. (Ex. 28 to Pl.'s Resp. at 190, 194.) Hoiles filed the underlying action shortly thereafter, on March 5, 2004.

In addition to the above evidence regarding Hoiles's communications with his attorneys regarding the fee agreement, Hoiles testified as follows with respect to his knowledge of his right to void the agreement before January 21, 2004: he did not receive any legal advice concerning California laws governing contingent fee agreements; he had no knowledge about California laws governing contingent fee agreements; and he did not receive any advice that the fee agreement with Alioto was void or voidable under any state's law. (Ex. 21 to Pl.'s Resp. at 132–34.)

7

**III. STANDARD OF REVIEW**

Summary judgment is appropriate under F.R.Civ.P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When applying this standard, a court reviews the pleadings and the documentary evidence in the light most favorable to the nonmoving party. *See Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988). To defeat a properly supported motion for summary judgment, "there must be evidence on which the jury could reasonably find for the" nonmoving party. *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In addition, "'where the non moving party will bear the burden of proof at trial on a dispositive issue' that party must 'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in order to survive summary judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 322).

**IV. ANALYSIS**

As noted in my prior order on Hoiles's motion for protective order, the *Fergus* court elaborated on the degree of knowledge a client must have in order to ratify an agreement that does not comply with § 6147:

8

> Assuming that [the contingency fee agreement] could have been
> ratified, ratification would have required knowledge by [the client] of his
> right to void the agreement. "[I]t is an inherent element of ratification that
> the party to be charged with it must have fully known what he was
> doing. . . . [T]he very essence either of an election or ratification is that it
> is done advisedly, with full knowledge of the party's rights."

*Fergus*, 59 Cal. Rptr. 3d at 289 (quoting *Brown v. Rouse*, 104 Cal. 672, 676 (1894) (internal quotation marks omitted) (alteration in original)).

Hoiles contends the above-described evidence demonstrates conclusively that, at the time he sent Alioto the January 21, 2004 letter, which I have held effectively voided the contingency fee agreement, Hoiles had no actual knowledge of his right to void the agreement. Accordingly, Hoiles argues, pursuant to the court's ruling in *Fergus* he could not have ratified the agreement. Alioto contends there are numerous fact issues as to when Hoiles learned of his right to void the agreement and when he exercised that right, precluding summary judgment on the ratification defense.

I agree with Hoiles that there is no evidence of the requisite knowledge on his part before January 21, 2004. There is certainly no indication that Hoiles learned independently from his attorneys that the fee agreement did not comply with § 6147 or any other state's laws, and there is undisputed, direct evidence that Barletta, Susemihl, Quan, and Johnson did not advise him as to the agreement's statutory compliance before that date. The deposition testimony of Hoiles, Barletta, Susemihl, and Quan all support that fact. Specifically, as noted above Hoiles testified he did not receive advice from any of these attorneys on the agreement's enforceability; Barletta testified he acted primarily as Hoiles's business advisor and that he assumed Susemihl or Quan

would review the agreement before Hoiles signed it; Susemihl testified that Hoiles sent him a copy of the agreement as an FYI, and he did not read it or provide advice to Hoiles on the agreement's enforceability; and Quan testified similarly. There is simply no evidence in the record to contradict these statements.

Alioto contends, however, that because Hoiles sent the agreement to three attorneys before signing it, because Barletta advised him to sign it, because Susemihl informed him that "[y]ou have a contract," and because Johnson provided some advice regarding his rights under the fee agreement before January 21, 2004, a jury could reasonably infer that at least one of those attorneys advised Hoiles of his right to void the agreement. I disagree. None of these facts is at odds with the direct testimony cited above. As Hoiles contends, Alioto's argument in this regard essentially amounts to an attack on the credibility of these witnesses, which by itself is insufficient to stave off summary judgment. Def.'s Reply at 11–12; *Anderson*, 477 U.S. at 256–57 (stating that "discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion" and that the non-movant must "present affirmative evidence in order to defeat a properly supported motion for summary judgment") (quotation marks omitted) (alteration in original). Alioto has provided no affirmative evidence to support his claim that Hoiles had actual knowledge of his right to void the fee agreement before January 21, 2004.

Alioto's remaining arguments in opposition to summary judgment are more aptly characterized as requests for reconsideration of several of my prior rulings. In support of these requests Alioto relies largely on distinguishable cases that involve ratification

10

of ordinary contracts, as opposed to fee agreements between attorneys and their clients that are strictly governed by regulatory statutes in order to protect those clients.

First, Alioto argues, for the third time, that a client need not have "actual knowledge" of a fee agreement's noncompliance with applicable law in order to ratify the agreement and that imputed knowledge is sufficient; thus, Alioto contends, the knowledge of Hoiles's attorneys regarding the agreement's enforceability can be imputed to Hoiles himself. I reject this argument for the reasons stated in my August 8, 2007 order (doc. # 524), which I need not repeat here. Moreover, even assuming a lawyer's knowledge should be imputed to his client for purposes of ratification of a voidable agreement under § 6147, there is no evidence Hoiles's attorneys had knowledge about the agreement's enforceability before January 21, 2004, notwithstanding Alioto's proposition that attorneys are "presumed to know the law" and to advise their clients accordingly. Pl.'s Resp. at 25 (citing *Borden v. Div. of Med. Quality*, 35 Cal. Rptr. 2d 905, 911 (Ct. App. 1994)). Leaving aside that Barletta does not actively practice law and that Barletta and Susemihl are not licensed in California, Barletta, Susemihl, and Quan all testified that they did not even read the agreement during the time period in question and by implication did not analyze the agreement's compliance with § 6147 (or any other state's law). According to Hoiles's testimony, Johnson was in the process of researching his rights under the fee agreement as of January 21, 2004. Accordingly, there is no evidence that any of the attorneys in question knew of the agreement's noncompliance with applicable law before January 21, 2004, and thus no such knowledge could be imputed to Hoiles.

11

I note that I find particularly unpersuasive Alioto's argument that "Alioto should not be punished" for Hoiles's lawyers' failure to advise him of his rights under § 6147. Pl.'s Resp. at 26. It was Alioto, and not any other attorney, who prepared a fee agreement that did not comply with § 6147. Moreover, as argued by Hoiles, "Section 6147 does not 'punish' Alioto or any attorney who fails to comply with its requirements; instead, Section 6147 expressly allows that attorney to collect a 'reasonable fee.'" Def.'s Reply at 20 (citation omitted). And Alioto is of course entitled to the "reasonable fee" the jury awarded him.

Alioto also contends that, based on the statements Hoiles made in the two February 2004 letters described above, Hoiles did not void the contingency fee agreement in the January 21st letter. Again, I resolved this issue after an extensive analysis in my August 8, 2007 order (doc. # 524), which I need not reiterate here, and I subsequently denied Alioto's motion to reconsider. I again decline to reconsider the ruling. Hoiles has never wavered from his position that he does not intend to pay Alioto a contingent fee under the agreement or that Alioto should perform no further legal services on his behalf. Under California law, as discussed in my prior order, this was sufficient to void the agreement pursuant to § 6147. Because there is no evidence that Hoiles "expressly or impliedly consented to the . . . contingency fee agreement after

learning of its voidability,"[3] *Fergus*, 59 Cal. Rptr. 3d at 289, Hoiles is entitled to summary judgment on Alioto's ratification defense.

**V.    CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment on the Issue of Ratification (doc. # 496) is GRANTED.  The final judgment in favor of Alioto on his unjust enrichment claim in the amount of $1,150,000, minus $500,000 previously paid to Alioto, shall be REINSTATED.

DATED:  December 21, 2007.

BY THE COURT:

*s/ John L. Kane*
_____
John L. Kane
United States Senior District Judge

---

[3] I note that I accept, as a matter of caution and deference, the *Fergus* court's statement in *dicta* that ratification may be implied despite the fact that the contract is limited by statute and must be strictly construed.  However, given the regulatory nature and clear purpose of the statute, which is to protect clients, that purpose would seem to be vitiated unless the same formalities that are required for a fee agreement to comply with the statute in the first place are also a prerequisite to a valid ratification of the agreement.